NOTICE

Decision filed 09/19/22. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2022 IL App (5th) 200272-U

NO. 5-20-0272

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|---|---|---|
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Madison County. |
| | ) | |
| v. | ) | No. 16-CF-2968 |
| | ) | |
| JERRY L. YEAGER JR., | ) | Honorable |
| | ) | Neil T. Schroeder, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE BOIE delivered the judgment of the court.
Justices Moore and Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held*:    We reverse the defendant's conviction of the lesser included offense of theft by deception of over $500, but not exceeding $10,000, where the State failed to present sufficient evidence to prove the defendant guilty beyond a reasonable doubt.

¶ 2    On December 22, 2016, the defendant, Jerry L. Yeager Jr., was charged by indictment with one count of aggravated home repair fraud in violation of section 5(a) of the Home Repair Fraud Act (815 ILCS 515/5(a) (West 2014)) and one count of theft by deception of over $10,000, but less than $100,000, in violation of section 16-1(a)(2)(A) of the Criminal Code of 2012 (Code) (720 ILCS 5/16-1(a)(2)(A) (West 2014)). During the defendant's jury trial, the State tendered, and the trial court gave, instructions to the jury on the lesser included offense of theft by deception of over $500, but less than $10,000, in violation of section 16-1(a)(2)(A) of the Code (*id.*). On May 16, 2019, a jury found the defendant guilty of the lesser included offense of theft by deception of over

1

$500, but not exceeding $10,000, in violation of section 16-1(a)(2)(A) of the Code (*id.*), and not guilty of the charge of aggravated home repair fraud. The trial court entered judgment on the verdict the same day.[1]

¶ 3       On May 23, 2019, the defendant filed a motion for judgment notwithstanding the verdict, or in the alternative, for a new trial. On August 21, 2020, the trial court denied the defendant's posttrial motion. The defendant was sentenced on August 28, 2020, to 28 days in jail to be served in two 14-day periods, 30 months of probation, and restitution in the amount of $9062.

¶ 4       The defendant now appeals his conviction and sentence raising two issues for this court's review. The first issue that the defendant raises on appeal is whether the State presented sufficient evidence to prove the defendant guilty beyond a reasonable doubt of the charge of theft by deception of over $500, but not exceeding $10,000. The second issue that the defendant presents on appeal is whether the trial court erred in failing to set out a method and manner of payment for the restitution that considered the defendant's ability to pay the restitution as required by section 5-5-6(f) of the Unified Code of Corrections (730 ILCS 5/5-5-6(f) (West 2014)). For the following reasons, we reverse the judgment of the trial court.

¶ 5                                I. BACKGROUND

¶ 6       In April 2014, the home and detached garage of James and Vickie Sago, located in Granite City, Illinois, was damaged during a hailstorm. Vickie testified[2] that she was out in her yard cleaning up after the storm when a young man approached her and handed her an advertisement

---

[1]The trial court's judgment was dated May 16, 2019, but was filed on May 20, 2019.

[2]All references to testimony within the background section refer to the testimony given at the defendant's trial.

2

flyer from Ultimate Roofing.[3] The flyer stated, *inter alia*, that Ultimate Roofing was owned by the defendant "& Family" and that Ultimate Roofing provided "Storm Damage Repair Experts" along with an "Insurance Claim Specialist." The Ultimate Roofing flyer also stated that Ultimate Roofing was licensed in Illinois, bonded, and insured.

¶ 7    Vickie informed the young man that the storm had done damage to her home, and the young man left to get his boss, Jim Simmons. A short time later, Simmons approached Vickie and together they viewed the damage to the Sagos' property, including the home, garage, and fencing. Vickie informed Simmons that she had a claim pending with her insurance company, AAA Insurance (AAA). Simmons returned to the Sagos' home a couple of days later and at that time, the Sagos agreed to allow Simmons to contact their insurance provider about completing the repairs.

¶ 8    Simmons testified that in April 2014, he was employed by Ultimate Roofing and that his boss was the defendant. Simmons stated that he had met the defendant in January or February 2014, while working for another roofing company performing the same job. Simmons stated that he met with the Sagos after a canvasser called to inform him that the Sagos had hail damage and needed an inspection. Simmons met with the Sagos, informed them that he would do an inspection of their home, and gave them a book that contained information about Ultimate Roofing. Simmons then inspected the Sagos' property for hail damage, and the inspection took approximately 20 to 30 minutes. After the inspection, Simmons provided the Sagos with AAA's telephone number and

---

[3]Ultimate Roofing is the trade name of Ultimate of Illinois Incorporated. During the defendant's trial, Ultimate Roofing was referred to by several names, *e.g.*, Yeager Roofing, Ultimate of Illinois, and Ultimate Roofing. For consistency, and to avoid any confusion, this court will refer to the company that entered into the contract with the Sagos for the repair of the damage to their home caused by the 2014 hailstorm as "Ultimate Roofing."

the Sagos contacted AAA and obtained a claim number. Simmons testified that he left his business card with the Sagos and informed the Sagos that, if they would like, he could be present when the AAA claim adjuster inspected their property. Only Simmons and the canvasser were present at the initial meeting with the Sagos.

¶ 9 Simmons returned to the Sagos' property about two weeks after the initial meeting and met with Travis Stewart, an independent claim adjuster hired by AAA. Simmons testified that the purpose of the meeting was to ensure that all of the damage to the Sagos' property was on the scope of loss[4] and to ensure that the roof and siding on the home was correctly measured. Simmons testified that he did not present a contract to the Sagos either at the initial meeting or when he met with the AAA adjuster at the Sago property.

¶ 10 Around the end of May 2014, Simmons stated that the defendant informed him that Ultimate Roofing had entered into a contract with the Sagos and that the Sagos had given the defendant a check. Simmons stated that he did not perform any work on the Sagos' property, and stated that after the sale, the project would have been turned over to the defendant. From his own observations, Simmons testified that he did not know whether or not the Sagos gave the defendant, or anyone from Ultimate Roofing, money nor could he testify to any of the repairs/replacements that would have been performed, or failed to be performed, in 2014. Simmons stated that he did not return to the Sagos' property until 2016.

¶ 11 Simmons further testified that he was supposed to be paid upon the completion of a job, normally 10 to 12%, but that he had not been paid concerning the Sagos' property since it was never completed. Simmons also stated that he was never paid for any of the work he performed

---

[4]According to Simmons's testimony, the "scope of loss" refers to a document generated by a program called Xactimate commonly used by insurance companies that provides a line item for each area of damage and the cost that the insurance provider will pay for the repair of that damage.

for Ultimate Roofing since the jobs were not finished, but that he had kept an accounting of all the work he performed for Ultimate Roofing in 2014. Simmons testified that he believed, at that time, that it was the intention of Ultimate Roofing to complete all of the jobs, including the Sagos' property. Simmons went on to testify that he also believed it was the intention of Ultimate Roofing to complete the Sagos' project when the defendant informed him that the defendant had received a check from the Sagos. Regarding the advertisement flyer that was given to the Sagos, Simmons stated that he believed that all the information on it, except the lifetime labor warranty, was accurate to the best of his knowledge, and that he had a copy of Ultimate Roofing's insurance, so he knew that Ultimate Roofing was insured.

¶ 12     Travis Stewart, an independent claim adjuster hired by AAA, testified that he conducted an inspection of the Sagos' property in April 2014, and completed an estimate for the damage caused by the hailstorm to the Sagos' property. The estimate included the removal of the entire roof, including the single layer of shingles that Stewart believed was on the Sagos' roof at the time of his inspection; the installation of new felt paper; new shingles; new ice and water shield; new drip edge; new pipe flashing; new attic vent; and a new gable. Stewart testified that upon completion of work, the Sagos' roof should have had a single layer of shingles and that the estimated replacement cost related to the roof was approximately $9700. Stewart stated that the estimate that he prepared did not include any siding repair, but that at a later time, an AAA staff adjuster was sent to the Sagos' property and a siding estimate was added to his initial estimate. Stewart stated that the estimated replacement cost of the siding was approximately $9000.

¶ 13     Stewart went on to testify that the final estimate sent to the Sagos from AAA also included detaching and resetting the satellite; replacing the gutters, gutter screens, and downspouts; replacing metal fascia; replacing a window; removing and replacing siding; wrapping a wooden

5

window and door frame with aluminum sheeting; repairing a portion of vinyl fencing; replacing a vinyl fence gate; and debris removal. The cost of all items to be repaired or replace on the Sagos' property on the AAA estimate totaled approximately $24,000. According to Stewart's testimony, AAA would issue a check to the Sagos, minus the depreciation, prior to the work being performed and then issue a check for the depreciated amount upon proof that the work had been completed.

¶ 14    James Sago testified that he was the owner of the property at issue located in Granite City, Illinois, that was damaged by a hailstorm in 2014. Numerous times during his testimony, James stated that it had been five years since the events had occurred and that his memory was not good. James stated that a young man approached his wife while she was out in the yard and told her he was with Ultimate Roofing and "more or less" solicited her for the repairs. The young man left and returned with Simmons to talk with James and his wife about the project. James stated that neither of the two individuals that he and his wife spoke with regarding the damage to his property were the defendant.

¶ 15    James stated that Simmons informed him of the projects that Ultimate Roofing was doing and "how good they was." James stated that Simmons informed him that "he could fix a roof and everything" but that James did not enter into a contract at that time or give Simmons any money, but told Simmons that he wanted Ultimate Roofing to make the repairs. James contacted AAA and stated that he did not hear from AAA until after Simmons had contacted AAA and got things going. AAA then sent out an adjuster in the middle of April 2014, and James received a scope of work "with the money and bids on it and everything."

¶ 16    James testified that he received two checks from AAA: one in May and one in June. When James received the first check, he stated that it was his belief that he had contacted Simmons and informed Simmons that he had received the check. James stated that, at the end of May, the

6

defendant came out with the contract and James wrote a check to Ultimate Roofing in the amount of the first check he had received from AAA as payment to begin the work on his property. James testified that he believed that the first and second checks, in sum total of approximately $15,000, were to do all the repairs based on AAA's estimate. James acknowledged that he had signed the contract with Ultimate Roofing for the repair of the damage caused by the hailstorm and that the date on the top of the contract was April 2, 2014. James stated that he had reviewed the AAA estimate, but that no one from AAA explained the estimate to him. James stated that he did not understand, now or at that time, the difference between present depreciated value and replacement costs, but that he did understand that depreciation is a reduced original cost due to age.

¶ 17    James stated that around October 2014, Ultimate Roofing installed a new roof on his home and garage. Shortly thereafter, there was a leak and the "little gal that helped put the roof on" came up in the middle of the rain and fixed the hole. James stated that there had been no other leaks and that the roof was still in place. James stated that, a few days after the leak was fixed, he called the defendant's wife to inquire when the siding was going to be done and the defendant's wife indicated that she would send someone out with a book so he could pick out the siding color, and that someone did come out with a book on the siding.

¶ 18    James stated that the siding was put on, give-or-take a couple of weeks, around November 2014, but that he paid for the labor for the siding in December 2014, with monies paid to him from his insurance company. James stated that he was familiar with roofing and had done roofing in the past, including his own roof on a previous home. James stated that he had never inspected his roof to determine how many layers of roofing were currently on his home. James testified, however, that there were not three layers of roofing since prior to 2014, he had the roof replaced, and during that replacement, the roof was completely removed in order to repair/replace some rafters and

7

wood. As such, James testified that he could guarantee that there was only a single layer of roofing on the home when the hailstorm occurred, and the defendant came to replace the roof.

¶ 19    James testified that the contract was with Ultimate Roofing and that he never gave the defendant any monies in cash. James testified that, prior to the roof leaking, there were individuals working on his roof, but that he could not recall how many and he also could not recall a dumpster being on the property, but he was not completely sure. James stated that the last time somebody was on his property doing work would have been around December 2014. James testified that some of the repairs had been completed, but that all of the repairs were never completed. James further testified that he picked up and paid for the siding that was installed on his house and that Robert Thornton helped facilitate getting the siding completed. James stated that he could not recall whether Thornton told him anything regarding the status of Ultimate Roofing.

¶ 20    James stated that he made no complaints to any authorities in 2014, since the work was in the process of being done. James stated that he did not make any complaints to the police or any governmental authorities in 2015. James stated that the first time he went to the police was in 2016, almost two years after the siding was completed. James testified that it took him two years to file a complaint because he and his wife wanted the siding and the roof done, and they knew that the defendant would not do the rest of it since they could not get ahold of him. According to James's testimony, "[h]e locked up, put no trespassing signs on his office," so James told his wife that the siding and roof were done, and that was the important part, and they should forget it. Then in 2016, James stated that he received a letter indicating that he and his wife were being sued for $7000 by the defendant. James said that he did not file a complaint at that time, but instead, hired an attorney.

¶ 21    As noted earlier, Vickie Sago also testified at the defendant's trial. Vickie testified that a couple of days after speaking with Simmons, they decided to allow Simmons to contact AAA to

8

inquire about getting the repairs completed. Vickie stated that she never saw the estimate that was prepared by AAA, and that it took three or four months until Ultimate Roofing repaired the roof. During that time period, Vickie stated that she made a couple of calls to Ultimate Roofing and that sometimes they would not answer the phone. Vickie also stated that her husband went to Ultimate Roofing's office at least three or four times, and that no one would answer the door. Vickie stated that Ultimate Roofing installed the roof in October, but that it was the only thing that had been completed, so Vickie again telephoned Ultimate Roofing and spoke with the defendant's wife a couple of times.

¶ 22 Vickie stated that the defendant's wife was the secretary in the office and would "put me off and tell me there was an emergency at home and she'd have to get back with me." Vickie stated that she never got anywhere with the defendant's wife. Vickie testified that she never spoke with the defendant's wife regarding the siding. Vickie stated that she kept calling Simmons and that Simmons told her to call Robert Thornton. Vickie stated that she spoke with Thornton and informed him that they did not get the work done and that they had given all the money they had received from the insurance company to the defendant.

¶ 23 Vickie testified that Thornton went with her husband to purchase the vinyl siding and then had some men install the siding. Vickie stated that, to her knowledge, Thornton never received any money. Vickie testified that she did not know whether they received any monies from the insurance company beyond the $15,000 given to the defendant since her husband took care of the checks.

¶ 24 Vickie identified several photographs that she testified were taken by her in approximately January 2015, after the roof and siding were completed. One photograph showed a window that Vickie stated was still in her garage and had not been installed. Vickie stated that, sometime in

2014, her husband and Thornton had ordered the wrong window, so a few weeks later, they had to return it and get the correct window. Vickie stated that the new window had not been installed. Another photograph showed damage to the Sagos' fence and gate, which Vickie stated had never been repaired. Vickie testified that she did not obtain a permit regarding the roof, but that she did obtain a permit for the installation of the fence and siding since she knew that they would need a permit from the city in order to get that work done.

¶ 25    Vickie stated that the siding that was installed on her home was the color and type of siding that she had selected. Vickie also stated that the old roof was not removed, but acknowledged that in May 2016, she may have stated under oath that the old roof had been removed. Vickie stated that she had made that statement in May 2016, because she had observed vehicles full of ripped out shingles being hauled away from her property in 2014. Vickie acknowledged that the only basis for her belief that the old roof was not removed was based upon what someone else had told her.

¶ 26    Vickie stated that there was another storm approximately two weeks after the roof was installed, that the roof leaked, and that someone from Ultimate Roofing came and repaired the leak. Vickie further stated, however, that the leak left a stain in her dining room, and that she had to get ahold of Thornton who worked for Ultimate Roofing. Vickie also stated that a few days after the roof was replaced, she spoke to the defendant's wife concerning the siding and that the defendant's wife informed her that she would send someone out with a book so she could choose the color of the siding. Vickie stated that Thornton then brought out the siding book. Vickie then changed her testimony to state that she did not speak with the defendant's wife, but instead, spoke directly to Thornton and then he brought out the siding book. Vickie acknowledged that in May 2016, under oath, she had stated that she had spoken to the defendant's wife and that it was the

10

defendant's wife who stated that she would send someone out with the siding book. Vickie acknowledged that her memory would have been better in May 2016. Vickie went on to testify that new gutters were never installed and that she had no understanding of the distinction between replacement cash value and depreciated cash value in the insurance industry.

¶ 27 Robert Thornton testified that he worked for Ultimate Roofing as a salesman, an estimator, and a coordinator of jobs. Thornton stated that he would coordinate with subcontractors and go over contracts to ensure that the insurance companies were paying everything correctly. Thornton stated that it was his goal to make sure people's houses got fixed and repaired correctly. Thornton stated that he did not personally perform work on the Sagos' property, but that he did arrange to have work performed on the Sagos' property. According to Thornton's testimony, he was contacted by Simmons and informed that the Sagos were trying to contact Ultimate Roofing because nothing had been done, other than the roof, and that they could not get a return call from Ultimate Roofing. Thornton stated that he met with the Sagos and then spoke with the defendant, once or twice, who stated that the job was going to be completed.

¶ 28 Thornton testified that the Sagos' repairs had not been completed and that he started to have a hard time contacting the defendant, so he called the Sagos' insurance company to inform them that the siding, the garage doors, and the fencing had not been done. Thornton stated that the only thing he observed as being completed were the gutters and the roof, but that the roof had a leak in it, which he arranged to have fixed. Thornton could not recall whether the defendant fixed the leak himself, or who actually fixed the leak, but that the leak was only fixed after the Sagos had contacted him. Thornton stated that he completed the siding and that the siding was completed to the Sagos' satisfaction. Thornton stated that both the leak in the roof and the siding were completed in 2014.

¶ 29    When Thornton was asked whether he was employed by Ultimate Roofing in 2014, he did not understand the question and asked counsel to define "employed." When asked whether he had some business relationship wherein he was supposed to provide work, labor, or other consideration in exchange for some sort of payment from Ultimate Roofing, Thornton stated that he did not provide labor, but sold jobs and was more of a supervisor of some sort. Thornton stated that he oversaw jobs that were signed up by Ultimate Roofing and would check on them to ensure things were getting done.

¶ 30    Thornton stated that the Sagos' property was never his job, but that he was attempting to complete the job for another sales representative, Simmons, and for Ultimate Roofing. Thornton stated that the first time he met the Sagos was in mid-2014 or fall 2014, after the roof was completed, and he was asked to go check on the roof. Thornton stated that he did not, however, inspect the roof at that time. As such, Thornton stated that he was not able to testify whether the old roof was removed, but that he could state that a new roof was installed. Thornton also stated that he could not testify to whether the new roof was properly installed, but acknowledged that the roofing shingles installed on the roof were a better product than shingles that had previously been on the home. Thornton further testified that new gutters had been installed, but that the fascia had not been installed. Thornton could not state whether, at that time, the Sagos had picked a color for their siding, but stated that he took it upon himself to do the siding since it was the next thing that needed to be completed.

¶ 31    Thornton testified that he did not believe he was employed or otherwise affiliated with Ultimate Roofing when he assisted the Sagos, since things between him and Ultimate Roofing had drifted apart and that he was just trying to help a customer that was not being helped. By "drifted apart," Thornton stated there was no communication between himself and Ultimate Roofing

12

because he could not get the defendant to answer the phone. Thornton testified that he did not inform the Sagos that Ultimate Roofing had "split up," and Thornton could not remember whether he told the Sagos anything along the lines that Ultimate Roofing was out of business.

¶ 32    Thornton stated that the siding was installed on the Sagos' house and outbuilding, but that he was not aware that the insurance company's estimate had left off some of the siding to be replaced. Thornton, however, stated that siding was put on all four sides of the house and was paid for by the insurance company. Thornton testified that he arranged for the work to be done, but that he never went back to inspect it, and that he did not do any work on the fencing.

¶ 33    Thornton testified that he had not worked for Ultimate Roofing since 2014, but that he had owned several businesses buying and fixing houses for resale, and performing siding, roofing, kitchen, and bathroom work. Thornton stated that his current company was named Elite Building Services. When asked the name of his previous businesses, Thornton refused to answer. Over an objection by the State, the trial court allowed the question and Thornton stated, "Okay. I opened up a company called Ultimate Roofing." Thornton testified that he opened Ultimate Roofing and Exteriors either at the end of 2014 or in 2015. Thornton stated that he opened the company with the same name as the defendant's company because he was getting phone calls and trying to get work done for other people, so he opened up a company and took the money to get other jobs done that were not being done. When Thornton was asked specifically whether he took checks that people were writing which were intended to go to Ultimate Roofing and instead were being deposited into his account, Thornton stated that there was one check, that the check went to getting the jobs finished, and that he sent a cashier's check to the defendant's wife for the remainder of the check.

¶ 34    Thornton stated that he did not receive a single penny in profit from the Sagos and that he had gotten their siding installed, talked to the insurance adjusters to release additional monies, and ordered the new window. Thornton stated that he personally did not receive any money from the insurance company. Thornton stated that he had contacted the Sagos' insurance company in October 2014, and that the money, which was over and above the money that was given to the defendant, was sent to the Sagos.

¶ 35    Thornton went on to testify that James Sago then purchased the materials and paid the labor. Thornton stated that he did not know exactly how much money was released by the insurance company, because James Sago controlled the money and Thornton never received any money from the Sagos. Thornton stated that he left a message with the defendant informing him that he was trying to get these jobs done, but that Thornton did not know whether he informed the defendant that he was contacting the insurance company and obtaining more money.

¶ 36    On October 11, 2016, the Sagos went to the Granite City Police Department and, according to the testimony of Richard Dawes, a peace officer with the Granite City Police Department, filed a complaint of either theft or fraudulent home repair, for work that had been done on their property. Jeffrey Donahey, a detective with the Granite City Police Department, then testified that after the original report was made, he interviewed the Sagos. Donahey testified that he also interviewed Simmons, whom the Sagos had indicated had handled the insurance bidding for the damage and had arranged for the work to be performed on their property. Donahey stated that Simmons agreed to accompany Donahey back to the Sagos' property for an inspection.

¶ 37    Detective Donahey testified that he had not received any extensive training on home repair by the police department nor had he ever owned a construction company, but stated that he had worked for construction company, approximately 25 years ago, from 1990 to 1996. Donahey

14

testified that on October 18, 2016, he toured the Sagos' property with Simmons and went line-by-line through the AAA scope of work estimate, which Simmons had indicated to Donahey was the work order for the damage to the Sagos' property. Donahey stated that he highlighted the items that Simmons indicated had not been performed. According to Donahey's testimony, Simmons would point out an area of work that had not been performed and if Donahey did not understand something regarding the repair, Simmons would explain it. Donahey stated that it was the first time he had been to the Sagos' property and that he was not aware of the condition of the Sagos' property prior to October 18, 2016.

¶ 38    Donahey testified that he observed that a roof had been installed, but that he could not determine how many layers of shingles there were, so he requested a housing inspector to come out and inspect the roof since he did not observe more than one layer of roof. Later in his testimony, Donahey testified that there was more than one layer of shingles on the roof in October 2016, based on the inspector stating that there was more than one layer of roof on the Sagos' home. Donahey again stated that he had not been to the residence in 2014, and as such, could not testify concerning the number of layers of shingles on the roof in 2014.

¶ 39    Donahey further stated that the vinyl siding had been replaced, but that the siding was done secondary, and at a later date, than the event that he was investigating regarding the defendant. Donahey testified that he did not see any foam insulation board; that the gutters and gutter guard were installed, but were sticking off the sides of the home by 8 to 10 inches; that the window had not been installed; that the window that was waiting to be installed was not the correct size; that the storm door assembly did not appear to have been replaced or repaired; that the attic vent, gable end vinyl, and downspouts still appeared to have the original hail damage; and that he could see hail damage to the fascia and wood wrapped window frame indicating that they had not been

15

replaced. Donahey also stated that no fencing work had been performed and that the fence gate was still leaning against the house.

¶ 40　Ralph Walden, a building inspector for the City of Granite City, testified that he had inspected an average of 15 to 20 houses a day over the 14 years he had been an inspector. Walden stated that he inspected the Sagos' home on November 15, 2016. According to Walden's testimony, there was no ice and water shield on the portion of the Sagos' home that he inspected, and the city's code required an ice and water shield on the type of roof that was on the Sagos' home. Walden stated that it was difficult to tell how many layers of roofing were on the Sagos' home, but that he estimated that there were three roofs on the house. Walden acknowledged that the only time he inspected the roof on the Sagos' home was 2½ years after the Sagos executed the contract with Ultimate Roofing. Walden also stated that, in 2014, there were miscellaneous permits, including window and siding, issued to Ultimate Roofing for work on the Sagos' property, but that no roofing permit had ever been issued. Finally, Walden stated that he only inspected the roof on the Sagos' home for the ice and water shield and, therefore, could not state whether anything else was wrong with the roof.

¶ 41　Lisa Schoeber, an employee of Granite City's building and zoning department, testified that she was responsible for maintaining the records for that department. Schoeber testified that there was never a roofing permit issued for the Sagos' property in 2014. Schoeber also testified that the actual permit is typed and placed in their system and, as such, the customer does not actually receive the permit, but instead, receives a receipt and a building placard that goes in the window of the property. The placard contains handwritten notations of the address, date, and permit number. Schoeber stated that she did not check to see if any permits were issued in the name of Ultimate Roofing or the defendant in 2014 since it is only by address, the property owner's

name, or permit number. The permit should have been in the name of the Sagos since they were the property owners, and the contractor's name, if any, goes to the left of the permit. The permit would also state who purchased the permit. Schoeber testified that the only permit she had located for the Sagos' property in 2014 was for the siding and one window.

¶ 42 After the State rested its case, the defendant filed a written motion for directed verdict that was argued outside the presence of the jury. After hearing arguments, the trial court, considering the evidence in the light most favorable to the State, denied the defendant's motion for directed verdict. Amanda Yeager was then called as the first witness on behalf of the defendant.

¶ 43 Amanda testified that she is married to the defendant and was familiar with Ultimate Roofing. Amanda stated that Ultimate Roofing was a corporation that performed home repairs, including roofing, and that in 2014, she worked for Ultimate Roofing. Amanda stated that her job with Ultimate Roofing included answering the phones and when a foreman went to obtain materials, she would pay for the materials over the phone with a debit card. Amanda also stated that she would go to the bank to obtain funds to pay the foremen, who were paid weekly. Amanda testified that she was familiar with the Sagos and stated that the flyer, identified by Vickie Sago as the one she had received, was from the Staunton, Gillespie, Mount Olive area since it had a "217" area telephone number and not the "618" number for the Granite City area that the Sagos should have been given. Amanda stated that everything contained in the flyer was true and that she did not personally give a flyer to the Sagos.

¶ 44 Amanda stated that Simmons initially dealt with the Sagos and that Simmons had his own person who canvassed and handed out flyers. Simmons's dealing with the Sagos would have been consistent with his job for Ultimate Roofing, and Amanda stated that neither herself nor the defendant were present when Simmons originally met with the Sagos in April 2014. Amanda also

17

testified that she was not present when the adjustor came to the Sagos' property. According to Amanda's testimony, all of the meetings with the Sagos and the work with the insurance adjustors up to this point were free of charge, and the Sagos were under no obligation to contract with Ultimate Roofing.

¶ 45    Amanda stated that, at the end of May 2014, she was in a vehicle with the defendant when Simmons called and stated that her husband should go pick up the checks from the Sagos and sign the contract since Simmons and Thornton were both working up north. Amanda then identified the contract that Ultimate Roofing executed with the Sagos, and the contract had the date of April 2, 2014, on the top portion of the contract. Amanda believed that the date of April 2, 2014, would be the date that the adjustor came out. Amanda stated that her husband took the contract to the Sagos and that her husband, to her knowledge, had never met with the Sagos prior to May 29, 2014. Amanda stated that the checks given to her husband by James Sago were taken to the bank and deposited into the business bank account of Ultimate Roofing.

¶ 46    Amanda stated that the next step would have been for the Sagos to pick out a roofing color and all the colors that they wanted for their home and that she believed that Thornton was taking care of the Sagos on behalf of Simmons. Amanda stated that the Sagos picked a roof color, and that the roofing materials were ordered from either RP Lumber or ABC Supply. Amanda stated that, at this time, Ultimate Roofing employed about 8 to 10 individuals including 5 roofers and individuals that ran the gutter machine and/or did siding. Amanda stated that Ultimate Roofing also used subcontractors.

¶ 47    Amanda testified that she personally knew that the Sagos' old roof was removed because she was there one afternoon with her husband and had started helping the crew to pick up trash from the yard when Vickie Sago yelled at her for being in the yard. Amanda stated that she told

18

Vickie who she was, and that she was helping the crew pick up the trash, including old shingles and nails. Amanda stated that it was the first time she had met Vickie Sago, but that she had spoken with her several times prior to that date.

¶ 48    Amanda further testified that there was a dump trailer at the Sagos' property to haul off the roofing materials that could be recycled. Amanda stated that she had been in the roofing business with the defendant for 15 years and that based upon her experience and her own observations, it was used shingles with hail damage that were placed in the dump trailer; that the Sagos' old roof was removed; that a new roof was installed; and that the ice and water shield was installed.

¶ 49    Amanda went on to state that Vickie Sago called her shortly after the roof was installed to inform her that there was a leak, and Amanda stated that an employee was sent out to fix the leak the same day. Amanda stated that she did not receive any other complaints about the roof from the Sagos. Amanda stated that Vickie Sago then called regarding the color of the siding and that Thornton was sent out with a sample book of colors for the Sagos to choose the color of their siding. According to Amanda, in October 2014, Vickie Sago picked out a special-order color which would take three to four weeks to arrive and would be more expensive than the colors that were in stock. As such, Amanda stated that they sent Thornton back to the Sagos to see if she would change the color, and Vickie Sago would not change her color, so they instructed Thornton to order the siding. According to Amanda's testimony, the color and siding type that Vickie Sago selected was not consistent with the type of siding listed on the insurance scope of work. As such, Amanda stated that there had been a conversation and an agreement reached with the Sagos to apply money that would have been used to repair the fencing to the upgraded special ordered siding. Amanda further stated that the scope of work listed an entire side of either the house or garage as not getting

19

new siding, but that Ultimate Roofing agreed to do the entire siding since a partial siding would look "funny."

¶ 50   Amanda stated that Thornton kept in contact with her and the defendant informing them of how things were going with the Sagos' property and that neither he, nor anyone else, mentioned a problem with the Sagos' property. Amanda stated that she was not made aware of the fact that James Sago paid for the siding because Thornton was supposed to be informing them of what was going on and, instead, he had formed his own company called Ultimate Roofing, took over the Sago project, and told the Sagos lies. When asked whether Ultimate Roofing had ever refunded the Sagos any monies, Amanda stated that the Sagos had never requested a refund.

¶ 51   Amanda further stated that it was the foreman and Thornton's responsibility to get a roofing permit for the Sagos' property because that was part of what a foreman got paid for, and that Thornton was being paid by Ultimate Roofing. According to Amanda's testimony, Bobby Childress would have been the foreman in charge of removing the roof; making sure the nails were removed; installing the ice and water shield; installing the drip edge, the soffit and facia; and that the shingles were installed correctly in a timely manner. Childress would also get the permit, dump trailer, and crew. According to Amanda's testimony, Bobby Childress did the roofing and then Thornton should have taken over and finished the job. As far as Amanda was aware, it was her understanding that a permit had been purchased for the Sagos' roof in 2014, since Ultimate Roofing had given the foreman cash money to purchase the permit.

¶ 52   Amanda stated that there was never any intent by Ultimate Roofing not to complete the Sagos' repairs and that Ultimate Roofing was being informed by Thornton that everything was being done. Amanda testified that Thornton never informed Ultimate Roofing that any portion of the Sago project had not been completed. Amanda stated that, at the time Ultimate Roofing entered

20

into the contract with the Sagos, they had every intention of finishing the job. Amanda acknowledged that Ultimate Roofing received $15,000 from the Sagos that was deposited in Ultimate Roofing's corporation account.

¶ 53   Regarding the Granite City inspector, Amanda stated that she recognized him as an inspector and that he was an inspector in 2014, but that he did not come out to the Sagos' property in 2014 or 2015. Amanda stated that the inspector's testimony that the roof was lacking a snow and ice melt was incorrect because all the inspector did was lift a corner of the shingles and that she was there when the roof was being installed and personally observed that the snow and ice melt had been installed. Amanda further stated that even if the permit was obtained, in her experience, the inspector does not normally come out and inspect while a project is ongoing and that she never had an inspector come out and inspect a roof unless the homeowner called them out.

¶ 54   Amanda stated that she did not personally have a roofing license, but that the defendant had an unlimited roofing license, which meant that he could do any type of roofing in the State of Illinois. Amanda stated that in April 2014, Ultimate Roofing had an active surety bond and insurance through Holt Insurance Company and explained that a surety bond provides that if a company does not do the work, the insurance will pay out so much money to the homeowner.

¶ 55   Finally, the defendant testified on his own behalf. The defendant stated that he was married to Amanda and was a roofing contractor. The defendant stated that in 2014, he owned a company by the name of Ultimate of Illinois Incorporated, tradename Ultimate Roofing, that was registered with the Illinois Secretary of State. The defendant stated that Ultimate Roofing performed all the exterior work on homes and that 90% of Ultimate Roofing's jobs were roofing and siding. The defendant stated that he had a prior company by the name of Ultimate Roofing and Exteriors

21

Incorporated approximately 12 years ago, but that he changed corporations when he went through a divorce since his former wife was part of the previous corporation.

¶ 56    The defendant stated that in 2014, and currently, he was an unlimited commercial licensed roofer in the State of Illinois and had been since 1993. The unlimited commercial license allowed the defendant to install and work on roofs on commercial properties such as Walmart, Kroger, and skyscrapers. The defendant stated that it was not an easy license to obtain and that an individual would have to pass the residential section of the roofing test to proceed to the commercial portion. The defendant stated that he had been in the roofing business for 25 to 30 years.

¶ 57    The defendant stated that he was from Granite City, Illinois, and that his business was located in Granite City, Illinois. The business only performed work in Illinois and did not perform any out-of-state work. The defendant stated that in 2014, Ultimate Roofing employed an average of 20 employees, depending on the season and workload, and that it also employed subcontractors. The defendant further stated that in early 2014, Ultimate Roofing would have had approximately six salesmen, including Simmons and Thornton.

¶ 58    The defendant identified one of the standard flyers that would have been handed out in 2014, although the defendant stated that the flyer had a "217" area code and the flyer for the Granite City area would have had a "618" area code. The defendant stated that the telephone number on the flyer did not make any difference, since the salesperson would give the customer their personal cell phone number so that a customer would have a way to contact a company representative at all times. The defendant testified that all of the information on the flyer would have been correct in 2014, that Ultimate Roofing was licensed, bonded, and insured, and that some of the warranties were lifetime warranties, depending on the type of job. The defendant further stated that Ultimate Roofing was a corporation, and that the defendant was the sole shareholder.

22

¶ 59     The defendant stated that he was familiar with the Sagos and that it was his understanding that Simmons met with the Sagos in early April 2014, regarding the damage to the Sagos' property. At that point, the defendant stated that he had never met or spoken with the Sagos, and that Simmons dealt with the Sagos and their insurance company. The defendant stated that Simmons also met with the Sagos' AAA adjustor and that no contract would have been signed since the Sagos were free to get additional estimates.

¶ 60     The defendant stated that Simmons had called him in May 2014 and told him that he was out at another project. Simmons further informed the defendant that the Sagos had received a check and scope of work in the mail, and since the defendant was in the area, Simmons requested the defendant to get the contract signed for the company and pick up the deposit check, which the defendant did in May 2014. The defendant stated that prior to that time, no money had been paid by the Sagos to anybody affiliated with Ultimate Roofing. The defendant further stated that at no point did he see the scope of work document since the salesperson took care of all of that.

¶ 61     The defendant stated that he received a check from James Sago on May 29, 2014, and another check on June 5, 2014, that were deposited in the account of Ultimate Roofing. The defendant testified that the purpose of the two checks was to validate the contract and to put funds into the account so that the project could be placed on the schedule. The contract with the Sagos was dated April 2, 2014, about two months prior to the first check, and the defendant testified that the date indicated when Simmons would have gone through the contract with the Sagos, had them sign it so that Ultimate Roofing could speak with their insurance company, and then provided a copy to the Sagos. At that point, the defendant stated that no one from Ultimate Roofing would have signed the contract so it was just a proposal, and the Sagos would have had two months to read and review the contract prior to giving the defendant the first check.

23

¶ 62 The defendant stated that he believed only James Sago was present when he went to pick up the check and could not recall whether Vickie Sago was present. The defendant stated that during the meeting, he spoke with James Sago about the damage in the area and also how long Ultimate Roofing had been in business. James Sago then indicated that he was comfortable signing the contract and the defendant informed him of an approximate date for the roofing: six to eight weeks out. The defendant testified that he believed everything that he had stated to James Sago in that conversation was true.

¶ 63 The defendant further stated that, after leaving the Sagos' home, he called Simmons and informed him that the contract had been signed and that the defendant had picked up a deposit check. The defendant stated that, at that time, Simmons inquired about getting his 10% advance on the deposit and that the defendant had made arrangements for Simmons to receive his advance. Since the deposit was $15,000, the defendant testified that Simmons's advance would have been $1500 for selling the job, and that it would then be Simmons who would make sure that everything was selected and ordered and work with the homeowner. According to the defendant's testimony, Simmons would ensure that the project was done, inspect the roof, and then collect the balance of the depreciation monies from the insurance company with the homeowner.

¶ 64 The defendant identified the Sagos' insurance scope of work document and stated that Ultimate Roofing had to contact the Sagos' insurance company several times because they had missed a lot of the damage on the house and had piecemealed the siding, which would have resulted in the home appearing cosmetically unattractive. Because of Ultimate Roofing's contact with the Sagos' insurance company, the original claim was increased considerably, from $15,000 to $24,000. The defendant testified that after the initial checks, neither he, nor Ultimate Roofing, received any additional money from the Sagos.

24

¶ 65    The defendant went on to testify that the Sagos' roof was replaced in 2014, including removal of the old roofing and hauling the old roofing away using dump trailers owned by Ultimate Roofing. The defendant stated that the ice and water shield was also installed. The defendant testified that he had personally visited the Sagos' property with his wife and that Thornton, the project manager, and Childress, the production foreman, were present when the defendant visited. The defendant testified that he personally observed that the old roof had been removed from the house and the garage, and that a single layer of architectural shingles, which is a two-layer shingle, was installed.

¶ 66    The defendant also stated that Thornton was told to obtain the permit, and when the defendant came to the Sagos' property, he asked Thornton where the permit was located. Thornton stated to the defendant that the permit was in the window of the home, and the defendant told Thornton to get the permit and put it in the front window of the van so that it could be seen from the road by an inspector. The defendant stated, however, that he never inspected the permit, but as far as he knew, it was a roofing permit. The defendant stated that he was not aware of any inspector coming by the Sagos' property in 2014.

¶ 67    The defendant further testified that the guttering and facia was put on at the same time as the roof and that Ultimate Roofing installed the siding on the Sagos' home in late 2014. After the roof was installed, the defendant stated there was a heavy rain and Vickie Sago called to tell them that the roof leaked, so Ultimate Roofing sent one of its repair technicians to fix the leak. The defendant stated that the next phone call they received from the Sagos was from Vickie Sago requesting to pick out the siding. The defendant stated that he called Thornton, since Thornton had taken over the Sagos' project from Simmons, and informed him that the Sagos were ready to pick out the siding. The defendant stated that he was 90% certain that it was Thornton who met with

25

the Sagos and that the Sagos picked a siding that had an availability problem and an increase cost over the siding that the insurance company had provided for.

¶ 68    The defendant stated that, at that time, he believed that the additional insurance checks had finally been released, and Thornton informed him that the Sagos were nervous and hesitant, and would feel more comfortable if they could pay for the material and keep track of it, and then at the end of the project, settle everything up with Ultimate Roofing. The defendant stated that he informed Thornton that was fine and to take care of the Sagos and keep things going. The defendant also testified that Thornton had informed him that there was an issue with the window that Thornton had ordered, and that Thornton was going to get a new window expedited. The defendant stated that Thornton advised him on the progress and stated that the Sagos were "kind of happy" handling the money. The defendant testified that he told Thornton to get things going because they needed to get the project completed. The defendant never saw the window in question because it was delivered to the Sagos' property and Thornton was the one supervising the job and had the daily control of the project.

¶ 69    The defendant stated that a few weeks went by, and that Thornton had informed the defendant that everything was going well. The defendant testified that when it came time to finish up the work, Thornton informed him that the job had been completed, and the defendant told Thornton that they needed to get together and to go through things. At that time, Thornton told the defendant something about the attorney general and that "if we didn't let it go," the attorney general may be called related to the Sagos' project and other items that Thornton was involved with at the time. The defendant stated that, at this time, he was not aware of the fact that Thornton had formed another business called Ultimate Roofing and Exteriors or that Thornton had received

checks payable to Ultimate Roofing. The defendant stated he believed that, during this time, Thornton was working for his corporation on the Sago project.

¶ 70    The defendant testified that Ultimate Roofing was on the preferred roofers list held at the Granite City building and zoning department and had been on the preferred roofer list for 10 or 15 years prior to the Sagos' project. The defendant stated that the monies Ultimate Roofing received from the Sagos was supposed to be the deposit after the damage was depreciated to get the project started, and that it was the defendant's understanding that Simmons and Thornton were working with the Sagos' insurance company to correct the oversights in the scope of work. As the work was completed, the defendant stated that the insurance company would pay the difference between the depreciated cash value and the replacement cost of what had been done. It was the defendant's understanding that the insurance company did send additional monies to the Sagos, after the deposit, for items that were missed on the scope of work.

¶ 71    The defendant stated that the scope of work allowed $8000 to $9000 for items related to the roof, but that the Sagos got architectural shingles, which was an upgrade, and the scope of work did not provide for the ice and water shield, which the Sagos also received. As such, the defendant testified that he did $10,000 to $12,000 worth of work on the Sagos' roof. The defendant stated that he believed the value of the siding that was installed to be approximately $12,000 to $13,000, so in total, the value of work that the defendant believed Ultimate Roofing had completed was approximately $21,000 to $22,000.

¶ 72    The defendant testified that Thornton had informed him that the Sagos did not want to do the repairs on the fencing because the Sagos had bartered with Thornton. The defendant stated again that, at the time, he believed that Thornton was his site supervisor and an employee of his corporation. The defendant testified that his relationship with Simmons and Thornton started to

27

break down in late 2014 and that by 2015, their relationship was "pretty well shot." While Simmons and Thornton were employed by Ultimate Roofing, they would have maintained all of the records related to the Sago project, from start to finish. Thornton, as job coordinator, would have had the packet which would have the file; receipts for items purchased; any communications from the insurance company; and any communications from anybody else. According to the defendant's testimony, Thornton would have that packet until the project was completed, at which time it should have been turned in to the office, and then the defendant and his wife would balance everything out and ensure an accounting and then come up with a total on the net profit, at which time Thornton would get a back-end payment. The defendant testified that when Thornton and Simmons left Ultimate Roofing in early 2015, all paperwork regarding the Sagos' project went with them and it was never given to the defendant or turned over to Ultimate Roofing.

¶ 73    The defendant further stated that Ultimate Roofing did not make a profit on the Sagos' project, but could not state whether Ultimate Roofing broke even or lost money since he did not have the records. The defendant admitted to receiving $15,000 from the Sagos on behalf of Ultimate Roofing. The defendant stated that, when he signed the contract with James Sago on behalf of Ultimate Roofing, he could not have "envisioned in his wildest dreams" that it would turn out this way and that he never intended it to turn out this way.

¶ 74    The defendant testified that, other than the fencing and the installation of the window, all other work had been performed on the Sagos' property. The defendant stated that it was his understating that the project was completed, and that the Sagos were happy. The defendant further stated that, at the time the contract was executed, it was his intention, and the intention of Ultimate Roofing, to complete all of the work contained in the Sagos' insurance scope of work. The defendant stated that neither he, nor anyone at his direction, intended to take money from the Sagos

28

that they were not entitled to and that neither he, nor anyone at his direction, intended to take money from the Sagos and not perform the work expected.

¶ 75    Finally, the defendant testified that the $15,000 he received from the Sagos was never placed into his own personal bank account nor did anyone show him photographs of any poorly installed or damaged gutters. The defendant also testified that the Sagos had called the office, but had never complained about the gutters to him or anyone that he was aware of. Further, neither the Sagos, nor anyone on behalf of the Sagos, had contacted the defendant at any time in 2015, 2016, 2017, 2018, or 2019, requesting that their window be installed.

¶ 76    At the close of the evidence, the defendant renewed his motion for directed verdict, which the trial court denied. On May 16, 2019, the jury returned a verdict of not guilty as to the charge of aggravated home repair fraud and a verdict of guilty as to the charge of theft by deception exceeding $500, but not exceeding $10,000. The trial court entered judgment on the verdict the same day.

¶ 77    On May 23, 2019, the defendant filed a motion for judgment notwithstanding the verdict, or in the alternative, for a new trial. The trial court conducted a hearing on the defendant's posttrial motion on August 21, 2020, and denied the defendant's posttrial motion in open court. On August 28, 2020, the trial court sentenced the defendant to 28 days in jail, to be served in two 14-day periods, 30 months of probation, and restitution in the amount of $9062.

¶ 78    The defendant now appeals his conviction and sentence arguing that the State failed to present sufficient evidence to prove the defendant guilty of the charge of theft by deception beyond a reasonable doubt. The defendant also argues that the trial court erred in failing to set out a method and manner of payment for the restitution that considered the defendant's ability to pay the restitution as required by section 5-5-6(f) of the Unified Code of Corrections (730 ILCS 5/5-5-6(f)

29

(West 2014)). The State concedes that the trial court failed to set out a method and manner of payment for the restitution as required. As such, we will focus our analysis on whether the State presented sufficient evidence to prove the defendant guilty of the charge of theft by deception beyond a reasonable doubt.

¶ 79                                    II. ANALYSIS

¶ 80    The due process clause of the fourteenth amendment to the United States Constitution requires that a defendant may not be convicted "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). When a court reviews a challenge to the sufficiency of the evidence, the question is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.) *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The *Jackson* standard applies in all criminal cases, regardless of the nature of the evidence, and "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id*. This court has adopted the *Jackson* formulation of the standard of review for claims that the evidence was insufficient to sustain a conviction, and this court will not retry the defendant, nor will we substitute our judgment for that of the trier of fact. See *People v. Cunningham*, 212 Ill. 2d 274, 278-79 (2004); *People v. Evans*, 209 Ill. 2d 194, 209 (2004). Although this court must allow all reasonable inferences from the record in favor of the prosecution, we may not allow unreasonable inferences such that if only one conclusion may reasonably be drawn from the record, we must draw it even if it favors the defendant. *Cunningham*, 212 Ill. 2d at 280.

¶ 81     The defendant argues that the State failed to prove the defendant guilty of the lesser included offense of theft by deception of over $500, but less than $10,000. According to the defendant's argument, the State only offered circumstantial evidence at trial and the circumstantial evidence failed to prove that the defendant intended to deceive the Sagos, intended to defraud the Sagos, and/or intended to permanently deprive the Sagos of their property. The defendant argues that the evidence at trial showed substantial compliance with the terms of the contract as Ultimate Roofing installed a new roof and siding on the Sagos' home. The defendant further argues that there was no evidence presented at trial that the defendant deceived, or intended to defraud, the Sagos at the time the contract was signed and the checks were transferred to the defendant.

¶ 82     In order for a defendant to be convicted of theft by deception, the State must prove beyond a reasonable doubt that "(1) the victim was induced to part with money; (2) the transfer of the money was based upon deception; (3) defendant intended permanently to deprive the victim of the money; and (4) defendant acted with specific intent to defraud the victim." *People v. McManus*, 197 Ill. App. 3d 1085, 1096 (1990). Section 15-4(e) of the Code defines "deception" as knowingly to:

> "(e) Promise performance which the offender does not intend to perform or knows will not be performed. Failure to perform standing alone is not evidence that the offender did not intend to perform." 720 ILCS 5/15-4(e) (West 2014).

¶ 83     Because direct evidence is rarely available, whether there is specific intent to defraud is a question of fact that may be proven by circumstantial evidence. *People v. Rolston*, 113 Ill. App. 3d 727, 731 (1983). "Evidence of intent to permanently deprive the owner of property may be inferred from the facts and circumstances surrounding the theft, including the act of the theft itself." *People v. Kotero*, 2012 IL App (1st) 100951, ¶ 31. Thus, intent may be inferred from

31

surrounding circumstances, including a defendant's conduct subsequent to entering a contract, as evidence of his intent at the time he entered into the contract. *People v. Jones*, 334 Ill. App. 3d 420, 425 (2002).

¶ 84    The State argues that at the time of the making of the contract, the defendant had the intent to defraud the Sagos and deprive them permanently of the benefit of their funds. As evidence of intent, the State argues that when the defendant personally accepted the funds and signed the contract, he created, confirmed, or failed to correct a false impression regarding the work that was being contracted, who would actually be responsible for completing the work, and who controlled his company. The State argues that the Sagos would have naturally presumed that the defendant, and not either Simmons or Thornton, would control the money and be responsible for completing the work and therefore, the jury could conclude that the contract was formed under false pretenses and that James Sago had relied on the defendant's false representations when transferring the funds. The State further argues that the evidence demonstrating that the Sagos' old roof had not been removed pursuant to the parties' contract was sufficient for the jury to have reasonably inferred, with respect to at least $500.01 worth of work, that the defendant had promised performance and never intended to perform that work.

¶ 85    In *People v. Riner*, 234 Ill. App. 3d 733, 738 (1992), the defendant's conviction for theft by deception was affirmed where there was sufficient evidence to demonstrate that the defendant "did not perform any part of the contract, nor did he offer any reasonable explanation of his failure to perform." Also, in *People v. Wheadon*, 190 Ill. App. 3d 735 (1989), the defendant's conviction of theft by deception was affirmed where the evidence established that the defendant immediately converted the money to his own use and made only a token pretense of fulfilling the contract. Additionally, in *People v. McManus*, 197 Ill. App. 3d 1085, 1098 (1990), the defendant's

conviction for theft by deception was affirmed where there was evidence that the defendant had taken down payments on tracts of land which he did not own and would never be able to receive the requisite financing in order to purchase the land. Finally, in *People v. Lighthall*, 175 Ill. App. 3d 700, 707 (1988), the defendant's conviction for theft by deception was affirmed where there was sufficient evidence to demonstrate that the defendant falsely represented himself as an accountant and there was no evidence that the defendant performed or intended to perform any of the services promised.

¶ 86    In this matter, the defendant testified that, at the time the contract was executed, it was his intention, and the intention of Ultimate Roofing, to complete all of the work contained in the insurance scope of work. James Sago also testified that he believed the contract would be performed in accordance with the scope of work when it was executed, and Simmons testified that he believed that it was the intention of Ultimate Roofing to complete the job when the defendant received the check from the Sagos. Thus, the only direct evidence presented by the State at trial did not support the State's contention that the defendant intended to defraud the Sagos.

¶ 87    There was also no evidence presented at trial that the representations on the flyer that the Sagos received were false or deceptive, or any evidence of hidden terms or conditions in the contract that were intended, or could be inferred, to deceive the Sagos. James Sagos testified that he entered into the contract with Ultimate Roofing and, as such, was aware that he was entering a contract with a corporation. There was no evidence that the defendant gave a false impression regarding who would complete the work, or that James Sago had a false impression that the defendant would personally perform, oversee, or be the individual on site during the repairs that the defendant failed to correct at the time that the contract was executed.

33

¶ 88    Although the State argues that the siding work was subsequently finished by a third party and was paid for with funds other than the $15,000 that the defendant received, Vickie Sago and the defendant both testified that it was their belief that Thornton was working for Ultimate Roofing during the period that Thornton was assisting the Sagos with the siding. As such, any deception regarding Thornton's employment or what company was performing the work cannot be imputed to the defendant.

¶ 89    The State acknowledges that there was conflicting testimony at trial regarding the repairs to the Sagos' property, but argues that the conflicting evidence involved credibility determinations that were the jury's duty to resolve. We agree; however, while the jury's determinations are entitled to great weight, a reviewing court has an obligation to set aside a conviction when the evidence is so unsatisfactory that it raises a reasonable doubt of the defendant's guilt. See *Rolston*, 113 Ill. App. 3d at 731. Whether the repairs were completed, or completed properly, is not an element of the crime of theft by deception as section 15-4(e) of the Code specifically states that the failure to perform standing alone is not evidence that the offender did not intend to perform. 720 ILCS 5/15-4(e) (West 2014).

¶ 90    In this matter, there is no dispute that a new roof and siding were installed on the Sagos' home and garage. The shingles and siding were above grade and the evidence indicated that Ultimate Roofing completed a major portion of the contract using quality materials, which does not support an intent to defraud or to permanently deprive the Sagos of the use and benefit of their property. The State has the burden of proving beyond a reasonable doubt all the material and essential facts constituting the crime of theft by deception, and "[w]here the defendant's actions between the time of the contract and the arrest manifest an intention to perform the contract, a conviction for theft by deception should not stand." *Riner*, 234 Ill. App. 3d at 736.

34

¶ 91    Here, the defendant testified that, based upon the information provided by Thornton, he believed that the repairs to the Sagos' property had been completed. James Sago testified that it took him two years after the siding was completed to file a complaint, and Amanda testified that neither the Sagos, nor anyone on their behalf, had ever requested a refund. There is no question that the defendant failed to fully perform on the contract and, in doing so, caused the Sagos significant emotional and potentially financial hardship. The Sagos may have a civil claim against the defendant, but based on the record before us, we are unable to find, after viewing the above evidence in the light most favorable to the prosecution, that a rational trier of fact could have found the elements of theft by deception since the evidence established only a failure to fully perform, but did not prove beyond a reasonable doubt an intent to defraud. Therefore, we reverse the judgment of the trial court finding the defendant guilty of the theft by deception of over $500, but less than $10,000.

¶ 92    The defendant also argues on appeal that the trial court erred in failing to set out a method and manner of payment for the restitution that considered the defendant's ability to pay the restitution as required by section 5-5-6(f) of the Unified Code of Corrections (730 ILCS 5/5-5-6(f) (West 2014)). This issue is now moot due to our determination that reversal is required based on the sufficiency of the evidence.

¶ 93                                    III. CONCLUSION

¶ 94    For the foregoing reasons, we reverse the judgment of the trial court.


¶ 95    Reversed.

35